IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Marilyn Martin, )<br>)<br>                                  Plaintiff, )<br>)<br>                 vs. )<br>)<br>Michael J. Astrue, )<br>Commissioner of Social Security, )<br>)<br>                                  Defendant. )<br>_____ ) | Civil Action No. 6:11-1572-TMC-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

   This case is before the court for a report and recommendation pursuant to

Local Civil Rule 73.02(B)(2)(a) DSC, concerning the disposition of Social Security cases in

this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

   The plaintiff brought this action pursuant to Section 205(g) of the Social

Security Act, as amended (42 U.S.C. 405(g)), to obtain judicial review of a final decision of

the Commissioner of Social Security denying her claim for disability insurance benefits

under Title II of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

   The plaintiff filed an application for disability insurance benefits ("DIB") on

March 20, 2007, alleging that she became unable to work on January 11, 2007. The

application was denied initially and on reconsideration by the Social Security Administration.

On December 24, 2007, the plaintiff requested a hearing. The administrative law judge

("ALJ"), before whom the plaintiff and Carroll H. Crawford, an impartial vocational expert,

appeared on September 22, 2008, and in a supplemental hearing held May 7, 2009,

considered the case *de novo*, and on September 30, 2009, found that the plaintiff was not

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to
consent to disposition by the magistrate judge.

under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on April 29, 2011. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.

2. The claimant has not engaged in substantial gainful activity since January 11, 2007, the alleged onset date (20 C.F.R. § 404.1571 *et seq.*).

3. The claimant has the following severe impairments: musculoskeletal disorder and depression (20 C.F.R. § 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) except due to her emotional issues, she requires an unskilled job with short and simple instructions with minimal changes to the routine and limited interactions with the public, supervisors and co-workers and due to her musculoskeletal and pain issues she is limited to lifting ten pounds occasionally, five pounds frequently, sitting six and standing two hours out of an eight hour work day, with only occasionally climbing, balancing, kneeling, crouching and crawling, and no requirement to climb ramps, ladders or scaffolds, or exposure to heights or moving machinery.

6. The claimant is unable to perform any past relevant work (20 C.F.R. § 404.1565).

7. The claimant was born on June 22, 1960, and was 46 years old, which is defined as a younger individual age 45-49, on the alleged onset date (20 C.F.R. § 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding of "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 C.F.R. Part 404. Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569, and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 11, 2007, through the date of this decision (20 C.F.R. § 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff

can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments that prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that his conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

The plaintiff has a history of undergoing a lumbar spine laminectomy, foraminotomy, and microdiskectomy at L5-S1 in November 1995 (Tr. 224-25, 239-40). Thereafter, a lumbar spine magnetic resonance imaging ("MRI") in January 2006 revealed

post surgical changes at L5-S1 without evidence of residual recurrent extruded disc or significant scar tissue formation and minimal right lateral protruding disc that did not significantly effect the exiting nerve root and would be of doubtful significance (Tr. 207). A lumbar spine computerized tomography ("CT") scan in June 2006 revealed minor findings consistent with degenerative disc changes at L5-S1 and degenerative joint changes at L4-5, without impingement, extruded fragment, disc protrusion, or stenosis (Tr. 397). Lumbar spine myelography in June 2006 was essentially negative, revealing only minor annular bulges (Tr. 398). Right hip x-rays in December 2006 were negative (Tr. 396).

Between January 16, 2007, and April 2, 2009, the plaintiff received treatment at the Anderson Area Medical Center/Anmed Health Pain Management/Piedmont Comprehensive Pain Management Group, L.L.C., Anderson, South Carolina. She received treatment with oral and injected medication, sensory stimulation for a back disorder causing back and lower extremity pain, and oral medication for complaints of hip and knee pain and depression. Examinations revealed an antalgic gait with "startup" pain, diffuse back tenderness to palpation right hip tenderness, mildly positive right straight leg raise testing, limited back ranges of motion due to pain, ambulation with an assistive device, and a mildly depressed affect. These examinations also revealed that the plaintiff was alert, oriented, and demonstrated good to fair spirits, the absence of significant lumbar spine tenderness, normal hip ranges of motion, functional knee ranges of motion bilaterally, grossly intact lower extremity sensation, present lower extremity reflexes, the ability to sit without apparent distress, negative left straight leg raise testing, and grossly normal gait and station and independent ambulation. Lower extremity electromyographic studies were normal (Tr. 271-79, 290-92, 295-96, 306, 339, 344, 395, 416-17, 420-21, 448-49, 453-54).

The plaintiff reported stable back and right leg pain, that medication and a transcutaneous electrical nerve stimulator ("TENS") unit were helpful for pain (Tr. 291-292, 306, 339, 344, 416, 420-421, 453-454) and that she thought she would benefit from use of

6

a cane (Tr. 448). She also reported that medication was somewhat effective for depression (Tr. 291, 416, 421) and, in October 2007, reported that her depression was improved overall (Tr. 416). She further reported in October 2007 that she recently returned from a Virgin Islands cruise (Tr. 416). She stated on several occasions that she had no medication side effects (Tr. 339, 416, 420).

Carol Burnette, M.D., concluded that the plaintiff's chronic depression and insomnia were stable/improving and recommended the plaintiff pace herself and exercise and stretch as tolerated (Tr. 339, 344, 416, 420-21, 449, 453-54)

In a statement dated April 19, 2007, Dr. Burnette indicated that the plaintiff would have to rest away from the work station for significantly more than an hour during the working portion of the work day and would have attention and concentration problems sufficient to frequently interrupt tasks during the working portion of the work day, due to lumbar post laminectomy syndrome, radicular leg pain, pain-related insomnia, and depression (Tr. 407).

In a statement dated February 5, 2008, Dr. Burnette indicated that the plaintiff had a back disorder causing discontinuance of work in January 2007 and current limited function and pain affecting persistence and concentration at work, due to which the plaintiff would "most probably" miss work hours and days. Dr. Burnette said the plaintiff had "always been straightforward," had not "exhibited excess pain behavior symptoms," and had been cooperative with treatment (Tr. 419).

In a statement dated May 4, 2009, Dr. Burnette indicated that the plaintiff was in the same condition as when Dr. Burnette rendered her February 2008 opinion and that her opinion was based upon the plaintiff's complaints and physical examination (Tr. 455).

Records of Anderson Psychiatry & Psychology, Anderson, South Carolina, including those of Kashfia Hossain, M.D., between January 23 and November 27, 2007, reveal the plaintiff was treated with medication for depression she related to back pain,

marital and other family difficulties, and work related stress. Examinations revealed a sad, depressed, or restricted affect, but also that the plaintiff was alert, oriented, polite, and pleasant, and demonstrated a reactive affect, good eye contact, normal speech, adequate attention and concentration, intact, goal-directed thought process, appropriate thought content, grossly intact memory, fair insight, and adequate judgment (Tr. 308-312, 336, 373, 418).

The plaintiff reported experiencing an improved mood with medication and experiencing a stable, "alright," or "so-so" mood. She also reported improved sleep with medication and improved pain with psychiatric medication. She further reported experiencing no medication side effects (Tr. 308-10, 336).

Dr. Hossain concluded in April 2007 that the plaintiff's depression was in partial remission (Tr. 308); in November 2007, that the plaintiff had a moderate work-related limitation in function due to a mental disorder; and in December 2007, that the plaintiff had significant mental functional limitations (Tr. 373, 404-405).

On May 18, 2007, Hugh Clarke, M.D., a State agency physician, determined that the plaintiff retained the physical residual functional capacity to lift and/or carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk and sit about six hours in an eight-hour workday; push/pull within her lifting capacity; climb ladders/ropes/scaffolds and stoop occasionally; and climb ramps/stairs, balance, kneel, crouch, and crawl frequently; and that she had no manipulative, visual, communicative, or environmental limitations (Tr. 328-31).

On September 13, 2007, Dale Van Slooten, M.D., a State agency physician, determined that the plaintiff retained the physical residual functional capacity to lift and/or carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk and sit about six hours in an eight-hour workday; push/pull within her lifting capacity; climb ladders/ropes/scaffolds and stoop occasionally; climb ramps/stairs, balance, kneel, crouch,

and crawl frequently; and perform work not requiring concentrated exposure to hazards such as machinery or heights; and that she had no manipulative, visual, communicative, or other environmental limitations (Tr. 365-68).

On December 5, 2007, Stephen S. Scher, Ph.D., a State agency psychologist, determined that the plaintiff retained the mental residual functional capacity to understand and remember simple to somewhat detailed instructions, to sustain attention for completing repetitive tasks for two-hour segments where speed is not critical, to tolerate coworkers and supervisors, and to adapt to routine changes (Tr. 390).

Lumbar spine x-rays on December 2, 2008, ordered by Charles Jones, M.D., revealed minimal degenerative changes (Tr. 446).

Larry R. Korn, D.O., a consultative osteopath, examined the plaintiff on December 2, 2008 (Tr. 434-438). The plaintiff reported a back disorder causing pain for which she took medication and used a TENS unit that were somewhat effective (Tr. 436). Examination revealed that the plaintiff was well groomed and demonstrated a normal mood, the abilities to communicate and comprehend adequately, and benign upper and lower extremity functioning (Tr. 437). Dr. Korn also noted positive Waddell's signs[2] (Tr. 438). Dr. Korn concluded that no findings indicated a need for permanent work restrictions and that such would be based upon the plaintiff's subjective complaints and history of back surgery, noting low back ranges of motion measurements were invalid due to the near total lack of hip and sacral motion demonstrated (Tr. 438). He indicated that the plaintiff could use her

_____

[2] Waddell tests are a set of five maneuvers easily performed during a routine physical examination that identify patients in whom nonorganic issues play a role in the persistence of symptoms; these nonorganic physical signs are: inappropriate, nonanatomic tenderness to light touch; vertical loading on a standing patient's skull and passive rotation of shoulder and pelvis in the same plane cause low back pain; discrepancy between findings on sitting and supine straight leg raise testing; cogwheel (give-way) weakness; nondermatomal sensory loss; and disproportionate facial expression, verbalization, or tremor during examination. *See* Robert L. Bratton, M.D., *Assessment and Management of Acute Low Back Pain* American Family Physician (November 15, 1999) http://www.aafp.org/afp/991115ap/2299.html (citations omitted).

hands and feet without restriction; that she had no environmental limitations; and that she could shop, travel independently, ambulate independently, use public transportation, climb a few steps at a reasonable pace, prepare a simple meal and feed herself, care for her personal needs, and sort, handle, use paper/files (Tr. 439-43).

Nancy L. Voight, Ph.D., a consultative licensed psychologist, examined the plaintiff on December 3, 2008. The plaintiff reported experiencing depression since 2006 or 2007, but said her primary disability was medical-related to her back disorder causing pain, for which she took medication and wore a back brace. She further reported that she cooked with effort, drove independently, shopped infrequently, and attended church services weekly. Examination revealed that the plaintiff was personable, nicely groomed, and cooperative with testing, and demonstrated logical and organized speech, the ability to think quickly, intact attention, test results indicating low average intelligence, and a slow gait without other abnormalities (Tr. 424-28). Dr. Voight noted that the plaintiff's math skills were too low to have her work with money (Tr. 427).

Dr. Voight noted that although the plaintiff took pain medication that often slowed cognitive processing and working memory, these were the plaintiff's areas of strength. She concluded that the plaintiff's depression was related to pain and did not contribute significantly to the plaintiff's possible work limitations (Tr. 427-28). She indicated that the plaintiff had no or only mild limitations in her abilities to understand, remember, and carry out instructions (Tr. 429), and that she had no limitations, with the exception of consistency and persistence, in her abilities to interact appropriately with supervision, coworkers, and the public, and to respond to changes in the routine work setting (Tr. 430).

In five undated statements, the plaintiff reported that she took hydrocodone (pain reliever), the antidepressants Cymbalta and Lexapro, Lunesta (sedative), Lyrica (anticonvulsant for neuropathic pain), Ultram (pain reliever), Nabumetone/Relafen (anti-inflammatory), vitamin D, and "Violelle Dot" [sic] (hormone therapy). She also used

10

Voltaren gel (topical anti-inflammatory), Flector patch (transdermal anti-inflammatory), Lidoderm patch (topical anesthetic), a TENS unit, and a cane (Tr. 138, 159, 186, 193-94, 203-04).

In a statement dated April 13, 2007, the plaintiff reported that she cared for her personal needs with effort or assistance in some tasks, performed limited household chores, prepared simple meals, operated a computer, read, performed limited sewing, performed limited camera use, tended a pet dog, drove an automobile, shopped, dined out occasionally, and attended church services with effort. She also reported that she did not require special reminders to care for personal needs or to go places; that she could manage household finances and go out alone; and that her condition did not affect her abilities to understand, to use her hands, or to get along with others (Tr. 141-47).

In a statement dated September 22, 2007, the plaintiff reported that she cared for her personal needs with effort, performed limited household chores, prepared simple meals, operated a computer, read, tended a pet dog, drove an automobile, traveled with effort, shopped, and attended church services. She also reported that she did not require special reminders to care for personal needs; that she could manage household finances and go out alone; and that her condition did not affect her abilities to remember, to complete tasks, to understand, to follow instructions, to use her hands, or to get along with others (Tr. 164-70).

At her hearing on September 22, 2008, the plaintiff testified that she had a back disorder status post remote surgery causing back and lower extremity pain for which she took medication and used a TENS unit. She also testified that she had depression for which she took medication. She further testified that she performed limited household chores, prepared simple meals with effort, read, drove an automobile occasionally, shopped occasionally, and attended church services (Tr. 44-52, 54-60).

11

At the plaintiff's hearing on May 7, 2009, Carroll Crawford, a vocational expert, testified that considering an individual of the plaintiff's age, education, and past relevant work experience, with a residual functional capacity to lift ten pounds occasionally and five pounds frequently; sit six hours and stand two hours out of an eight hour work day; to climb, balance, stoop, kneel, crouch, and crawl occasionally; to perform work not requiring use of ropes/ladders/scaffolds, or exposure to heights or dangerous moving machinery; and to perform work allowing use of an assistive device to ambulate; mild limitations in understanding, remembering, and carrying out (simple tasks) and making simple work-related decisions; moderate limitations in interacting appropriately with the public, supervisors, and coworkers, and responding appropriately to usual work situations and changes in routine work settings; and moderate to marked limitations in understanding, remembering, carrying out complex instructions and making judgments on complex work decisions, jobs existed in the regional and national economies such an individual could perform. He cited unskilled sedentary[3] jobs of order clerk, addresser, and surveillance monitor as examples and provided the incidence of these jobs in the regional and national economies (Tr. 34-37).

## ANALYSIS

The plaintiff alleges disability commencing January 1, 2007, when she was 46 years old, due to a back disorder and depression. She has a twelfth grade education and a certificate in nursing. The plaintiff has past work experience as a clerical technician, a corrections officer, a nurse's aide, a store manager, and a ward secretary. The ALJ found that the plaintiff's musculoskeletal disorder and depression were severe impairments. The ALJ further determined that the plaintiff could not perform her past relevant work, but could perform a reduced range of sedentary work that existed in significant numbers in the

---

[3] Sedentary work involves sitting six hours and walking and standing two hours in an eight-hour day and lifting no more than 10 pounds at a time. *See* 20 C.F.R. § 404.1567(a) (citing SSR 85-28).

national economy.  The plaintiff argues that the ALJ erred by (1)  giving little weight to the medical opinions of Dr. Burnette; (2)  failing to consider the combination of her mental and physical impairments; (3) giving an incomplete hypothetical to the vocational expert; and (4) improperly relying on the vocational expert's testimony because of a conflict between the vocational expert and the DOT.

### Opinion Evidence

The plaintiff first argues that the ALJ erred in failing to properly evaluate the opinions of Dr. Burnette.  The regulations require that all medical opinions in a case be considered, 20 C.F.R. § 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list:  (1)  the length of the treatment relationship and the frequency of the examinations; (2)  the nature and extent of the treatment relationship; (3)  the evidence with which the physician supports his opinion; (4)  the consistency of the opinion; and (5)  whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. § 416.927(d)(2)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005).  However, statements that a patient is "disabled," "unable to work," meets the listing requirements, or similar assertions are not medical opinions.  These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 416.927(d)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  Social Security Ruling 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5.  As stated in Ruling 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory

> diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in [20 C.F.R. § 416.927]. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

In a statement dated April 19, 2007, Dr. Burnette indicated that the plaintiff would have to rest away from the work station for significantly more than an hour during the working portion of the work day and would have attention and concentration problems sufficient to frequently interrupt tasks during the working portion of the work day, due to lumbar post laminectomy syndrome, radicular leg pain, pain-related insomnia, and depression (Tr. 407).

In a statement dated February 5, 2008, Dr. Burnette indicated that the plaintiff had a back disorder causing discontinuance of work in January 2007 and current limited function and pain affecting persistence and concentration at work, due to which the plaintiff would "most probably" miss work hours and days. Dr. Burnette stated the plaintiff had "always been straightforward," had not "exhibited excess pain behavior symptoms," and had been cooperative with treatment. Dr. Burnette noted that, on physical examination, the plaintiff had a positive straight leg raising test, an abnormal gait pattern, and difficulty walking on her right toe. She had problems with limitation of function and pain in her back and legs that was consistent over time and consistent with the sort of problems that occur after operations for herniated discs. Dr. Burnette further noted that the January 2006 MRI showed moderate degenerative changes and some degree of disc bulging and was consistent with a back that one would suspect would be somewhat symptomatic (Tr. 419).

14

In a statement dated May 4, 2009, Dr. Burnette indicated that the plaintiff was in the same condition as when Dr. Burnette rendered her February 2008 opinion and that her opinion was based upon the plaintiff's complaints and physical examination (Tr. 455).

The ALJ found as follows with regard to Dr. Burnette's opinions:

> As for the opinion evidence, I note that Dr. Burnette's statements do not appear to be clear with regard to whether she is referring to the work that the claimant did most recently, the medium exertional detention officer position, or whether she was referring to all work. I suspect it is the former and I agree with her assessment. The claimant's history of back surgery and her more recent orthopedic problems would definitely preclude her from working in situations where she had to "manhandle" individuals and participate in physical training exercises. However, if Dr. Burnette's statements are meant to refer to all occupations, I do not find support in her medical records or any other records for such restrictive limitations. Since Dr. Burnette did not provide an opinion as to what she considered the claimant's functional capacity, I can only say that a finding that the claimant can perform no work activity is an issue reserved to the Commissioner. The only physical limitations that I could find in Dr. Burnette's notes were that the claimant "pace" herself, and exercise and stretch as tolerated. I have not accorded significant weight to Dr. Burnette's opinion insofar as it is a blanket restriction of all work activity. I also do not see any support for a finding that the claimant would miss work or need to rest with the frequency suggested by Dr. Burnette, unless, again, we are discussing her exertionally medium past employment.

(Tr. 22).

The plaintiff first argues that since the ALJ found an ambiguity in Dr. Burnette's opinions (whether or not she was referring to all work or the plaintiff's former position as a detention officer), he was required by the Social Security regulations to recontact Dr. Burnette to resolve the ambiguity (pl. brief at 23-25) (citing 20 C.F.R. §§ 404.1512(e), 416.912(e)).[4]    However, this court finds that the evidence from Dr. Burnette was not

---

[4] At the time of the ALJ's decision and the parties' briefs in this case, these regulations provided:

Recontacting medical sources: When the evidence we receive from your treating

15

inadequate for the ALJ to determine whether the plaintiff is disabled, although this court further finds that the ALJ did not give sufficient reasons to discount Dr. Burnette's opinions, as will be discussed below. Here, Dr. Burnette stated in February 2008 that the plaintiff "would most probably miss hours out of *any* work day and days out of any work month as a result of limited function and pain, which would affect her ability to persist at work, and which would affect her ability to concentrate on *basic work tasks*" (Tr. 419) (emphasis added). Accordingly, it appears to this court that Dr. Burnette's opinion did not regard the plaintiff's ability to perform her former position as a detention officer but instead referred to all work. Accordingly, the ALJ did not err in failing to recontact Dr. Burnette.

The plaintiff further argues that the ALJ did not give sufficient reasons to discount Dr. Burnette's opinions. This court agrees. The ALJ stated that Dr. Burnette did not provide an opinion as to the plaintiff's functional capacity, and, therefore, the opinion that the plaintiff could not work was an issue reserved to the Commissioner. However, as argued by the plaintiff, Dr. Burnette did state that if the plaintiff attempted to work an eight hour day on a five day basis, she would "most probably have to rest away from the work station for significantly more than an hour during the working portion of the work day" and would "most probably have problems with attention to and concentration sufficient to frequently interrupt tasks during the working portion of the work day" (Tr. 407). Further, Dr. Burnette's second opinion indicated that, since January 2007, the plaintiff's condition was such that she would most probably miss hours out of any work day and days out of any work month as a result of limited function and pain, which would affect her ability to persist at

_____

physician . . . is inadequate for us to determine whether you are disabled, . . . [w]e will first recontact your treating physician . . . to determine whether the additional information is readily available. We will seek additional . . . clarification from your medical source when the report from your medical source . . . contains a conflict or ambiguity.

20 C.F.R. §§ 404.1512(e), 416.912(e). The regulations were amended effective March 26, 2012, and this subsection was removed.

work and which would affect her ability to concentrate on basic work tasks (Tr. 419). As noted by the plaintiff, these limitations of function were significant enough for the vocational expert to testify that the plaintiff could not work with such limitations when questioned by the plaintiff's attorney (Tr. 37-38). Moreover, even if Dr. Burnette's opinion was considered a blanket restriction of all work activity, the ALJ was still required to "evaluate all the evidence in the case record to determine the extent to which the [treating physician's legal conclusion] is supported by the record." SSR 96-5p, 1996 WL 374183, at *3.

The ALJ further stated that Dr. Burnette's opinions were not supported by her treatment notes (Tr. 22). However, Dr. Burnette's treatment notes show positive physical findings, including positive straight leg raise testing, antalgic gait, tenderness on palpation, difficulty toe walking, and weakness in the plaintiff's lower extremities (Tr. 280-82, 285-88, 292-93, 306, 339, 344, 416, 420-21, 453-54, 448-89). Further, the plaintiff's lumbar range of motion had been found to be decreased by 50% for forward flexion, backward bending, and sidebending to the left, with increased radiculopathy on repeated movement (Tr. 212). Dr. Burnette examined the plaintiff every couple of months between May 17, 2006, and April 2, 2009. The Commissioner lists numerous references to "normal findings" (def. brief at 14). However, as argued by the plaintiff, this is *post-hoc* rationalization as the ALJ did not indicate that he diminished Dr. Burnette's opinions based on these findings. *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ.").

The Commissioner also argues that Dr. Burnette's statements as to the plaintiff's limitations were inconsistent with the plaintiff's report that her "back and right leg pain were stable" and her reports to Dr. Burnette that "medication and a TENS UNIT were helpful for pain . . ." (def. brief at 16). However, again, this is *post-hoc* rationalization not offered by the ALJ in rejecting Dr. Burnette's opinion.

The Commissioner argues (def. brief at 14-15) that the ALJ, in making his residual functional capacity ("RFC") finding, was entitled to rely on the opinion of Dr. Korn, an orthopedic specialist who performed a consultative examination (Tr. 436-38) of the plaintiff in December 2008 and concluded that no findings indicated a need for permanent work restrictions (def. brief at 14-15 (citing *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) (opinions of non-treating examining physician may serve as substantial evidence when consistent with independent clinical findings or other record evidence)).  However, as pointed out by the plaintiff, Dr. Korn failed to answer many of the questions on the Medical Source Statement of Ability to Perform Work-related Activities form and indicated that he was "unable to comment" on the plaintiff's ability to lift and carry, on her ability to sit, stand, walk, or on her postural limitations (Tr. 439-44).  Nor did Dr. Korn evidence any awareness of any of her recent medical records or any review of the objective data (Tr. 436-38).  Further, the Commissioner's argument assumes that the ALJ properly discounted Dr. Burnette's opinion, which this court finds he did not.

Based upon the foregoing, this court recommends that, upon remand, the ALJ be instructed to re-evaluate the opinions of Dr. Burnette in accordance with the above.

### Combined Effect of Impairments

The plaintiff argues that the ALJ failed to properly consider the combined effect of her impairments. When, as here, a claimant has more than one impairment, the ALJ must consider the severe and nonsevere impairments in combination in determining the plaintiff's disability.  Furthermore, "[a]s a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989).  It "is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render claimant unable to engage in substantial gainful activity.... [T]he [Commissioner] must consider the combined effect of a claimant's impairments and not

fragmentize them." *Id.* (citing *Reichenbach v. Heckler*, 808 F.2d 309 (4th Cir.1985)). The ALJ's duty to consider the combined effect of the plaintiff's multiple impairments is not limited to one particular aspect of its review, but is to continue "throughout the disability determination process." 20 C.F.R. § 404.1523.

The plaintiff argues that ALJ failed to consider the combined effect of her mental and physical impairments. Specifically, the plaintiff notes that Dr. Voight, to whom the ALJ assigned significant weight to his opinion, found that the plaintiff's depression "is related to pain and is unlikely to improve unless her pain condition improves" (Tr. 428). Further, the plaintiff testified that she gets "real depressed because of the pain" (Tr. 52). In response, the Commissioner argues:

> In the instant case, the ALJ thoroughly discussed Plaintiff's musculoskeletal and mental functioning, established a residual functional capacity contemplating all of Plaintiff's physical and mental functional limitations that were supported by the medical and nonmedical evidence for the reasons discussed herein, and correctly determined that Plaintiff did not have impairments which, either singly or in combination, prevented her from performing other work in the national economy (Tr. 17-25). Therefore, the ALJ properly determined that, considering the record as a whole, Plaintiff could perform a reduced range of sedentary work.

(Def. brief at 24).

Here, the evidence draws a clear correlation between the plaintiff's mental and physical conditions. While the ALJ discussed the plaintiff's mental and physical impairments independently, he did not discuss the cumulative effects the impairments had on the plaintiff's ability to work. Accordingly, upon remand, the ALJ should be instructed to consider the combined effect of the plaintiff's mental and physical impairments in accordance with the above-cited law.

***Vocational Expert***

The plaintiff next argues that the ALJ did not set forth all of her impairments in the hypothetical to the vocational expert. The ALJ found that the plaintiff had moderate difficulties with regard to concentration, persistence, or pace (Tr. 18). The plaintiff argues that the ALJ erred in failing to include this limitation in the hypothetical to the vocational expert. "In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, . . . , and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) (citations omitted).

The RFC finding was as follows:

> [T]he claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except due to her emotional issues, she requires an unskilled job with short and simple instructions with minimal changes to the routine and limited interaction with public, supervisors and coworkers and due to her musculoskeletal and pain issues she is limited to lifting ten pounds occasionally, five pounds frequently, sitting six and standing two hours out of an eight hour work day, with only occasionally climbing, balancing, kneeling, crouching and crawling, and no requirement to climb ramps, ladders or scaffolds, or exposure to heights or moving machinery.

(Tr. 18-19). In the hypothetical question to the vocational expert, the ALJ asked him to assume:

> a mild limitation in understanding and remembering, carrying out and making judgments on simple work-related decisions. Her ability to understand and remember complex instructions, care [sic] out complex instructions and the ability to make judgments on complex work decisions would be in the moderate to marked range. Her ability to interact with the public, interact appropriate with supervisors, interact with coworkers and respond appropriately to usual work setting situations and changings [sic] in routine work settings would be at the moderate range.

(Tr. 35).

The plaintiff contends that the limitation to "an unskilled job with short and simple instructions with minimal changes to the routine and limited interaction with public, supervisors and co-workers" is not sufficient to encompass her moderate deficiency in concentration, persistence, or pace, as found by the ALJ. The Commissioner argues in response that the ALJ's finding regarding her moderate limitation in concentration, persistence, or pace was used to rate the severity of her mental impairment at steps two and three of the sequential evaluation process, and thus the fact that the ALJ did not use those ratings as a RFC assessment, but rather made a more detailed RFC assessment, did not render his RFC assessment inconsistent with his step two or three findings.[5]

The Commissioner further argues that the ALJ did more than simply limit the plaintiff to simple, unskilled work due to her concentration difficulties. He also limited her to work requiring no more than minimal changes in routine and no more than limited interaction with the public, supervisors, and co-workers (def. brief at 20-21). The Commissioner argues that because of favorable objective medical findings and the ALJ's consideration of inconsistencies between the plaintiff's testimony and other evidence of record in evaluating her credibility, the RFC assessment and hypothetical question were appropriate (def. brief at 21-23). The Commissioner cites findings including intact, adequate attention (Tr. 373, 427), adequate concentration and ability to concentrate well enough to demonstrate low average intelligence on testing with areas of strength in cognitive processing and working memory despite medication (Tr. 373, 427), and grossly intact

---

[5]     As noted by the ALJ in his discussion at steps two and three, and as explained in SSR 96–8p:
          The limitations identified in the "paragraph B" criteria are not an RFC assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96–8p). Therefore, the following residual functional assessment reflects the degree of limitation I have found in the "paragraph B" mental functional analysis.
(Tr. 18).

21

memory (Tr. 312, 373). Further, the plaintiff reported that she did not require special reminders to care for personal needs or to go places (Tr. 142, 145, 170); that she could manage household finances (Tr. 144, 169), and go out alone (Tr. 144-145, 167, 169); and that her condition did not affect her abilities to remember, to complete tasks, to understand, to follow instructions, or to get along with others (Tr. 146-147, 164, 168). Dr. Voight concluded that the plaintiff's depression did not contribute significantly to the plaintiff's possible work limitations (Tr. 427) and indicated that the plaintiff had no or only mild limitations in her abilities to understand, remember, and carry out instructions, and that she had no limitations, with the exception of consistency, in her abilities to interact appropriately with supervision, coworkers, and the public, and to respond to changes in the routine work setting (Tr. 429-30). Similarly, Dr. Scher determined that the plaintiff retained the mental RFC to understand and remember simple to somewhat detailed instructions, to sustain attention for completing repetitive tasks for two-hour segments where speed is not critical, to tolerate coworkers and supervisors, and to adapt to routine changes (Tr. 390).

The plaintiff argues that because the Commissioner specifically found she had "moderate difficulties with regard to concentration, persistence, or pace," but did not include such a limitation in the RFC and hypothetical to the vocational expert, there is an inconsistency in the judge's findings. The plaintiff cites cases from other circuits in support of her argument (pl. reply at 10-11). Specifically, the Seventh Circuit Court of Appeals has stated:

> The Commissioner continues to defend the ALJ's attempt to account for mental impairments by restricting the hypothetical to "simple" tasks, and we and our sister courts continue to reject the Commissioner's position. *Craft v. Astrue*, 539 F.3d 668, 677-78 (7th Cir.2008) (limiting hypothetical to simple, unskilled work does not account for claimant's difficulty with memory, concentration, or mood swings); *Ramirez [v. Barnhart*, 372 F.3d 546,] 554 [(3d Cir. 2004) (hypothetical restriction to simple one or two-step tasks does not account for limitations of concentration); *Kasarsky [v. Barnhart*, 335 F.3d 539,] 544 [(7th

> Cir.2003)] (constructing hypothetical question about a person
> with borderline intelligence does not account for deficiencies in
> concentration); *Smith v. Halter*, 307 F.3d 377, 380 (6th
> Cir.2001) (restricting hypothetical to jobs without quotas, rather
> than to simple tasks, adequately addresses impairment in
> concentration). In fact, the Social Security Administration itself
> rejects that position. SSR 85-159.

*Stewart v. Astrue*, 561 F.3d 679, 685 (7th Cir. 2009). In a recent case in this district, the

Honorable R. Bryan Harwell, United States District Judge, found that the ALJ's decision in

that case that the claimant "can engage in simple, routine tasks or unskilled work despite

limitations in concentration, persistence, and pace is supported by substantial evidence, and

the hypothetical was appropriate." *Sensing v. Astrue*, C.A. No. 6:10-cv-3084-RBH, 2012

WL 1016581, at *7 (D.S.C. 2012) (slip copy).

Based upon the foregoing, this court finds that the ALJ properly considered

the plaintiff's limitations in concentration, persistence, and pace in reaching his RFC

assessment. This court further finds that the ALJ's hypothetical to the vocational expert

sufficiently accounted for the plaintiff's limitations in this regard. However, as this court finds

that remand is appropriate for other reasons as discussed herein (and specifically with

regard to the testimony of the vocational expert as discussed below), the ALJ should be

instructed upon remand to include the plaintiff's moderate deficiency in concentration,

persistence, or pace in his hypothetical to the vocational expert.

The plaintiff further alleges the ALJ failed to identify and resolve conflicts

between the vocational expert's testimony and the *Dictionary of Occupational Titles* ("*DOT*").

Social Security Ruling 00-4p provides in pertinent part:

> When a [vocational expert ("VE")] . . . provides evidence about
> the requirements of a job or occupation, the adjudicator has an
> affirmative responsibility to ask about any possible conflict
> between that VE . . . evidence and information provided in the
> [Dictionary of Occupational Titles ("DOT")]. In these situations,
> the adjudicator will:

> Ask the VE . . . if the evidence he or she has provided conflicts with information provided in the DOT; and
>
> If the VE's . . . evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.
>
> When vocational evidence provided by a VE . . . is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the VE . . . evidence to support a determination or decision that the individual is or is not disabled. The adjudicator will explain in the determination or decision how he or she resolved the conflict. The adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified.

SSR 00-4p, 2000 WL 1898704, at *4.

The ALJ's RFC finding limited the plaintiff to no more than unskilled tasks; short, simple instructions; minimal changes in routine; and limited interaction with the public, supervisors, and co-workers. In response to a hypothetical question based on this RFC, the vocational expert testified that the plaintiff could perform "other work" in occupations such as order clerk, addresser, and surveillance monitor (Tr. 36). The vocational expert indicated that there were no conflicts "between the skill or exertional requirements of these jobs and those described the DOT" (Tr. 37). However, the plaintiff argues that there is a potential conflict between the DOT and the vocational expert's testimony because each of the three jobs identified by the vocational expert has a General Educational Development[6] reasoning level ("GED:R") higher than that allowed by the ALJ's limitation to "unskilled jobs with short

---

[6] [GED] embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance." U.S. Dept. of Labor, DOT, App. C § III, 1991 WL 688702 (Fourth Ed. Rev.1991). The DOT specifies the GED requirements required for each job, including the level of reasoning skills. Reasoning level one requires the worker to "[a]pply commonsense understanding to carry out simple one-or two-step instructions [and][d]eal with standardized situations with occasional or no variables in or from these situations encountered on the job." *Id.* Reasoning level two requires the worker to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions [and][d]eal with problems involving a few concrete variables in or from standardized situations." *Id.* Reasoning level three requires the worker to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form [and][d]eal with problems involving several concrete variables in or from standardized situations." *Id.*

and simple instructions." The plaintiff contends that the limitation to simple tasks correlates to a reasoning level of one, while the order clerk (DOT 209.567-014) and surveillance monitor (DOT 379.367-010) jobs have a reasoning level of three, and the addresser job (DOT 209.587-010) has a reasoning level of two.

The Commissioner argues the ALJ properly relied on the vocational expert's testimony because "GED does not describe the specific mental or skill requirements of a particular job, but does describe the general educational background that makes an individual suitable for the job" (def. brief at 26). The Commissioner further argues that the plaintiff

> focuses on one aspect of her residual functional capacity, to the exclusion of her particular educational background, and makes no attempt to explain how her education is in any way inconsistent with jobs classified as reasoning level 2 or 3. As such, Plaintiff has failed to specifically articulate any conflict between the vocational expert's testimony and the DOT on this basis.

(Def. brief at 28). The Commissioner further cites case law from other circuits finding that a person limited to work involving simple and repetitive tasks could perform a job with a reasoning level of two or three (def. brief at 29-32 (citing *Meissl v. Barnhart*, 403 F. Supp. 2d 981,984 (C.D. Cal. 2005); *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009); *Renfrow v. Astrue*, 496 F.3d 918, 921 (8th Cir. 2007)).

The plaintiff notes that there is a split in decisions on this issue. *See Mattison v. Astrue,* No. 09-C-060, 2009 WL 2591628, at *29 (E.D. Wis. Aug. 21, 2009) (collecting cases). Although the Fourth Circuit has not yet decided the issue, several district courts within this circuit have remanded for further administrative proceedings where the ALJ failed to inquire of the vocational expert regarding whether a claimant limited to simple, routine, repetitive work was capable of performing certain jobs that the DOT classified as reasoning level of two or three. *See Lane v. Astrue,* No. 2:11cv6, 2012 WL 1032705, at *5 (W.D. N.C. March 9, 2012) ("Because the ALJ did not inquire on the record as to whether the vocational

evidence was consistent with the DOT and did not obtain any explanation for the apparent conflict between the ALJ's assessment that Plaintiff was limited to simple work involving one or two step tasks and instructions and the vocational expert's testimony that Plaintiff could perform jobs with a reasoning level of three, the ALJ erred by relying on the testimony."); *Yurek v. Astrue*, No. 5:08-cv-500-FL, 2009 WL 2848859, at *9 (E.D. N.C. Sept. 2, 2009) (finding "that the DOT's reasoning level three requirement conflicts with the ALJ's prescribed limitation that Claimant could perform only simple, routine, repetitive work" and remanding to the ALJ to address the conflict); *Patterson v. Astrue*, C.A. No. 8:07-1602-HFF-BHH, 2008 WL 2944616, at *5 (D.S.C. July 31, 2008) (noting vocational expert never expressly discussed whether plaintiff's inability to perform more than 1-2 step instructions was compatible with the position requiring at least a reasoning level of two); *Tadlock v. Astrue*, C.A. No. 8:06-3610-RBH, 2008 WL 628591, at *10 (D.S.C. March 4, 2008) (remanding so that the vocational expert could give testimony as to whether the plaintiff could perform the recommended jobs, which had a reasoning level of two, considering the claimant's inability to do more than simple and routine work).

Here, there is a potential conflict between what the plaintiff is capable of performing and what the recommended jobs require. As the ALJ never discussed with the vocational expert whether the plaintiff's inability to perform more than simple, unskilled work was compatible with the cited positions, it would be speculation for the court to assume the vocational expert realized the conflict and necessarily considered it. Accordingly, upon remand, the ALJ should be instructed to obtain vocational expert testimony as to any conflict between the reasoning levels for such jobs and the limitation that the plaintiff can perform no more than unskilled work with short and simple instructions.

## CONCLUSION AND RECOMMENDATION

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. § 405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.

s/ Kevin F. McDonald
United States Magistrate Judge

July 27, 2012
Greenville, South Carolina